UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: November 16, 2015
```

------------------------------------------------------------------X
                                :
VILMA RAMOS,                         :
                                :
                   Plaintiff,    :        13-cv-3421 (KBF)
                                :
           -v-                  :        OPINION & ORDER
                                :
COMMISSIONER OF SOCIAL SECURITY,   :
                                :
                   Defendant.   :
------------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

       Plaintiff Vilma Ramos seeks review of the decision by defendant Commissioner of Social Security finding that she was not entitled to disability insurance benefits under Title II of the Social Security Act.

       Plaintiff applied for disability insurance benefits on March 24, 2011. (Tr. 137-40.) After her initial application was denied by a letter dated June 1, 2011 (Tr. 75-77), she requested a hearing before an administrative law judge ("ALJ"). (Tr. 85-86.) The ALJ conducted a hearing on February 24, 2012; he determined that plaintiff was not disabled. (Tr. 22-71, 7-18.) The Appeals Council denied plaintiff's request for review on March 25, 2013. (Tr. 1-4.) This suit followed. (ECF No. 1.)

       Before the Court are the parties' cross-motions for judgment on the pleadings. (ECF Nos. 14, 20.) As set forth below, plaintiff's motion is GRANTED, defendant's motion is DENIED, and this action is remanded to the Commissioner for further proceedings.

I.     BACKGROUND

Plaintiff is a 41 year old woman residing in the Bronx.  (Tr. 29, 26.)  She attended two years of college and has worked as an administrative assistant, receptionist, and, most recently, medical record data entry clerk.  (Tr. 13, 35, 37-39.)

The back problems that are the basis of plaintiff's disability claim began in June 2007 when she fell down a flight of stairs while at work.  (Tr. 13, 28, 207.)  She left that job a week later, began attending physical therapy, and did not work again until she found a less demanding job in February 2008.  (Tr. 207, 488.)  In March 2008 she had MRIs of her cervical and lumbar spine that revealed desiccation and central bulges in six discs.  (Tr. 214-15.)  In January 2009, plaintiff's treating physician, Dr. Eric Jacobson, diagnosed her with cervical sprain and strain, sprain/strain lumbar, myofascial pain syndrome cervical, and myofascial pain syndrome lumbar and noted that she had pain from her spine through her shoulders, forearms, and wrists.  (Tr. 265-67.)  At that point, Dr. Jacobson described plaintiff as suffering a 50% temporary impairment according to the standards of the New York State Worker's Compensation Board.  (Tr. 267.)

Plaintiff continued to work until March 24, 2010, when her back pain resulted in her going to the Emergency Room at Jacobi Medical Center.  (Tr. 30-31.)  She has not worked since.  (Tr. 31.)  An April 2010 EMG study revealed severe left C7, C8 radiculopathy.  (Tr. 218)  In May 2010 Dr. Jacobson revised his assessment of plaintiff's impairment: from that date to present he has indicated in repeated

filings to the New York State Worker's Compensation Board that plaintiff suffers a 100% impairment according to the Board's standards.  (Tr. 222-33.)

In July 2010 Dr. Myriam Vanegas, a physician at Bronx Lebanon Hospital, diagnosed plaintiff with cervical pain, left upper extremity pain, and lower back pain.  (Tr. 353.)  Dr. Vanegas indicated that plaintiff would need physical therapy and pain management but could work in a sedentary position in a modified work environment that only required limited reaching, lifting, and carrying.  (Tr. 351-53.)

On May 6, 2011 Dr. William Lathan conducted a consultative examination of plaintiff.  (Tr. 371-73.)  He assessed her gait and stance as normal and noted that she could change clothes, get on and off the exam table, and rise from a chair without difficulty or assistance.  (Tr. 372.)  Dr. Lathan documented that plaintiff's "[c]ervical spine shows full flexion, extension, lateral flexion and fully rotary movement bilaterally" and that her "[l]umbar spine is flexed to a maximum of 20 degrees.  Extension, lateral flexion and rotational movements are limited bilaterally.  Straight leg raising negative bilaterally."  (Id.)  He also noted no difficulty with hand and finger dexterity or grip strength.  (Tr. 373.)  Dr. Lathan assessed the plaintiff as being able to "perform all activities of personal care and daily living," and concluded that "[t]here is a moderate restriction for bending, lifting, pushing, pulling, stooping, squatting and strenuous exertion."  (Tr. 371, 373.)

In June 2011 plaintiff's initial application for benefits was denied.  (Tr. 75-77.)  Her review hearing before an ALJ was held on February 24, 2012.  (Tr. 22-71.)

ALJ Jack Russak held the hearing, plaintiff and her attorney attended in person, and Dr. Gerald Winkler, a medical expert, and Richard Alvariche, a vocational expert, attended by telephone.[1]  (Tr. 22.)

In response to the ALJ's questions, plaintiff recounted her employment history, her current residency, and her daily life.  (Tr. 29-49.)  She testified that she dressed herself and at times had difficulty taking a shower or bath because reaching wrong could trigger pain.  (Tr. 33.)  She explained that she attended physical therapy three times per week and also received occasional trigger point injections.  (Tr. 34, 36.)  She also testified that she did most of her shopping online as she could not, for example, carry enough wait to shop for food, and that when not attending physical therapy mostly stayed at home, lying down.  (Tr. 34-35, 44-45, 47.)  Plaintiff reported being able to do dishes and laundry and make her bed, but not vacuum or take out the garbage or do any other more-than-minimal housework.  (Tr. 46.)

Plaintiff testified that Dr. Jacobson was her primary doctor, and that he was currently prescribing tramadol and cyclobenzaprine, a recent change from her former prescription of oxycodone and ibuprofen.  (Tr. 39-41.)  She described her pain as radiating down both arms and the tops of her legs and causing her to lose feeling.  (Tr. 41-42.)  She testified that sitting made her spine "feel[] like it's compressed,"

---

[1] The Court notes that the telephone connection during the hearing appears to have been quite weak, at times to the point of incomprehensibility.  See, e.g., Tr. 57-58 ("Q: Okay.  Have you heard the testimony today?  A: Say that again?  Q: Have you heard the testimony today?  A: Yes, I'm ready to give my testimony today.  Q: And have you heard the claimant testifying?  A: Well, I heard, you know, it was pretty good when she was talking about her work history.").

and so she would stand and "if it gets too bad, doing both, [she would] lay down."
(Tr. 44.)  According to plaintiff, this occurred frequently: she testified that if she had
appointments outside of her home she would "lay[] down for a couple of hours in
between," and stated "If I'm home, I'm laying down."  (Tr. 47, 48.)

   In response to questions from her attorney, plaintiff further clarified that
even when lying down certain positions could trigger pain.  (Tr. 49-50.)  She
testified that there are "plenty" of days that she barely got out of bed, and that such
bad days occurred "four times" in "a week or two weeks."  (Tr. 50-51.)

   Dr. Winkler, a neurologist, then testified that he had not examined or treated
plaintiff, but had reviewed the medical records that had been made exhibits to
plaintiff's file before the hearing.  (Tr. 51-55.)  Based on those records, including the
MRI and EMG findings, Dr. Winkler diagnosed plaintiff with "degenerative disease
of the cervical and lumbar spine with electrical evidence of left cervical
radiculopathy."  (Tr. 53.)  However, he further testified that in his opinion plaintiff
had "some of the requirements, but not sufficient to constitute a meeting of [all of
the requirements of the spine impairment included in the Commissioner's medical
listings as] 1.04a."[2]  (Tr. 54.)  He noted plaintiff's complaints of pain and numbness,
but also noted that "there is no finding of motor loss or muscle atrophy and there is

_____

[2] See Listing of Impairments, 20 C.F.R. § 404, Subpt. P, App. 1 (2015) ("1.04 Disorders of the spine
(e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative
disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including
the cauda equina) or the spinal cord. With:
A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain,
limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle
weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back,
positive straight-leg raising test (sitting and supine).").

no finding of reflex loss," and that "the straight-leg raising is negative." (Id.)  Dr. Winkler concluded that plaintiff "does have the disorder, but not to the degree or extent that would enable [him] to say that she needs 1.04a." (Id.)

The final person to testify during the hearing was Alvariche, the vocational expert.  (Tr. 56-67.)  The ALJ asked him to describe the jobs available to "a person of the claimant's age, education and work experience who is able to do sedentary work, have a sit-stand option, allowing the alternating sitting or standing for every 30 minutes, could not climb ladders, ropes or scaffolds, occasionally climb ramps and stairs, occasional stoop, kneel, never crouch, crawl[, and in] terms of manipulative limitations, can occasionally reach, can occasionally overhead reaching, can occasionally handle objects with gross manipulations." (Tr. 59.)  In response to this description, the vocational expert concluded that plaintiff could not perform any of her prior work, but could find a job in at least three fields with available positions: information clerk, surveillance system monitor, and telemarketer.  (Tr. 59-64.)  The expert reported that he had seen each of these positions "performed as a sit-stand option." (Tr. 64.)  In response to questions from the ALJ and plaintiff's attorney the expert reported that these jobs would still be available if the employee had to take one or two unexcused or unscheduled absences per month, but that more than that "would probably jeopardize the job," and that an employee "off-task for more than 10 percent of the day … would have difficulty retaining the position." (Tr. 64-66.)

On March 5, 2012 ALJ Russack denied plaintiff's application for a period of disability and disability insurance benefits.  (Tr. 10-18.)  He found that plaintiff suffered "the following severe impairments: degenerative disease of the cervical and lumbar spine; lumbar and cervical sprain/strain; and cervical radiculopathy."  (Tr. 12.)  But he also found that she did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1," and that "[n]o treating or examining physician has mentioned findings that are the same or equivalent in severity to the criteria of any listed impairment, nor does the evidence show signs or findings that are the same or equivalent to those of any listed impairment."  (Id.)

The ALJ's decision set out the medical evidence in the record, including the reports of Drs. Jacobson, Vanegas, and Lathan and the testimony of Dr. Winkler. (Tr. 13-15.)  The decision described the weight given to each of these doctors' opinions as follows:  Dr. Winkler's testimony was "given significant weight because he reviewed [plaintiff's] medical evidence of record and his opinions [were] based on expertise."  (Tr. 16.)  Dr. Vanegas's opinion was "given little weight as it was rendered within four months of [plaintiff's] alleged onset date and is not consistent with the medical evidence of record as a whole."  (Id.)  Dr. Lathan's assessment was "given great weight because [it was] consistent with [plaintiff's] level of functioning."  (Id.)  About Dr. Jacobson, ALJ Russack wrote that his "medical opinion that the claimant had a one-hundred percent disability is accorded little weight since that assessment was inconsistent with the latest physical of the

claimant [and] was based on worker compensation rules and regulations; and represent[s] an opinion on an issue reserved to the Commissioner of Social Security." (Id.)

The ALJ determined that plaintiff's "current level of functioning demonstrates that her pain is not as debilitating as she has alleged," because she "continued on the same medication, which she reported alleviated her pain for almost two years.  Had [plaintiff's] pain been as debilitating as she testified she would have sought other treatment methods to alleviate her pain." (Id.)  Thus, although plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms … [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" her report within the past year of "being able to perform all activities of personal care and daily living." (Id.)

In light of all of the above, ALJ Russack concluded that "there are jobs that exist in significant numbers in the national economy that [plaintiff] can perform." (Tr. 17.)  He therefore found that plaintiff "is not disabled under sections 216(i) and 223(d) of the Social Security Act." (Tr. 18.)  Plaintiff sought review before the Appeals Council, which denied her request in March 2013, (Tr. 1-4) and then filed this lawsuit in May 2013 seeking either a determination that she was entitled to disability benefits or a remand for reconsideration.  (ECF No. 1.)

II.     APPLICABLE LEGAL PRINCIPLES

     A.     Judgment on the Pleadings

     "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings."  Bank of N.Y. v. First Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010) (citation omitted).  Therefore, "[t]o survive a Rule 12(c) motion, the complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  Id. (quoting Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010)).

     B.     The Disability Standard

     The Commissioner will find a claimant disabled under the Act if he or she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A). The disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3).

The Commissioner uses a five-step process when making disability determinations. See 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1 ["Appendix 1"]. If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity.
>
> Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity ["RFC"] to perform her past work.
>
> Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (citation and footnote omitted); see also Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998).  The claimant bears the burden of proof in steps one through four, while the Commissioner bears the burden in the final step. Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012).

C.    Review of the ALJ's Judgment

The Commissioner's and ALJ's decisions are subject to limited judicial review.  The Court may only consider whether the ALJ applied the correct legal standard and whether his or her findings of fact are supported by substantial

evidence.  When these two conditions are met, the Commissioner's decision is final.
<u>See Burgess v. Astrue</u>, 537 F.3d 117, 127-28 (2d Cir. 2008); <u>Veino v. Barnhart</u>, 312
F.3d 578, 586 (2d Cir. 2002); <u>Rosa v. Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999);
<u>Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998) ("We set aside the ALJ's decision
only where it is based upon legal error or is not supported by substantial evidence."
(citation omitted)); 42 U.S.C. § 405(g).

Substantial evidence means "more than a mere scintilla. It means such
relevant evidence as a reasonable mind might accept as adequate to support a
conclusion." <u>Pratts v. Chater</u>, 94 F.3d 34, 37 (2d Cir. 1996) (quoting <u>Richardson v.
Perales</u>, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted).  If the
Commissioner and ALJ's findings as to any fact are supported by substantial
evidence, then those findings are conclusive. 42 U.S.C. § 405(g); <u>Diaz v. Shalala</u>, 59
F.3d 307, 312 (2d Cir. 1995).  While the Court must consider the record as a whole
in making this determination, it is not for this Court to decide de novo whether the
plaintiff is disabled.  <u>See Schaal v. Apfel</u>, 134 F.3d 496, 501 (2d Cir. 1998); <u>Beauvoir
v. Chater</u>, 104 F.3d 1432, 1433 (2d Cir. 1997); <u>Veino</u>, 312 F.3d at 586 ("Where the
Commissioner's decision rests on adequate findings supported by evidence having
rational probative force, we will not substitute our judgment for that of the
Commissioner.").  The Court must uphold the Commissioner's decision upon a
finding of substantial evidence, even when contrary evidence exists.  <u>See Alston v.
Sullivan</u>, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to
support either position, the determination is one to be made by the factfinder."

(citation omitted)); see also DeChirico, 134 F.3d at 1182-83 (affirming an ALJ decision where substantial evidence supported both sides).

      D.    The Treating Physician Rule

      "[T]he treating physician rule generally requires deference to the medical opinion of a claimant's treating physician," although an ALJ need not afford controlling weight to a treating physician's opinion that is "not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citations omitted). An ALJ who does not accord controlling weight to the medical opinion of a treating physician must consider various factors, including "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; [and] (iv) whether the opinion is from a specialist." Id. (citing 20 C.F.R. § 404.1527(d)(2)). After considering these factors, the ALJ must "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Id. at 33.

      Although the ALJ will consider a treating source's opinion as to whether a claimant is disabled or able to work, the final responsibility for deciding those issues is reserved to the Commissioner, and the treating source's opinion on them is not given "any special significance." 20 C.F.R. § 404.1527(d)(e); see also SSR 96-5p, 1996 WL 374183, at *3 (July 2, 1996); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). When a finding is reserved to the Commissioner, "the Social Security

Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative." <u>Snell</u>, 177 F.3d at 133.  It is the ALJ's duty, as the trier of fact, to resolve conflicting medical evidence.  <u>See</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 399 (1971).

> E.   <u>The ALJ's Duty to Develop the Record</u>

Although "[t]he claimant has the general burden of proving that he or she has a disability within the meaning of the Act," "the ALJ generally has an affirmative obligation to develop the administrative record." <u>Burgess v. Astrue</u>, 537 F.3d 117, 128 (2d Cir. 2008) (citations and internal quotation marks omitted). SSA regulations require an ALJ to "inquire fully into the matters at issue and . . . receive in evidence the testimony of witnesses and any documents which are relevant and material to such matters." <u>Id.</u> (quoting 20 C.F.R. § 702.338).  "In light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" <u>Id.</u> at 129 (citation omitted); <u>see also</u> <u>Calzada v. Asture</u>, 753 F. Supp. 2d 250, 277 (S.D.N.Y. 2010) ("If the ALJ is not able to fully credit a treating physician's opinion because the medical records from the physician are incomplete or do not contain detailed support for the opinions expressed, the ALJ is obligated to request such missing information from the physician." (citing <u>Perez v. Chater</u>, 77 F.3d 41, 47 (2d Cir. 1996))).

III.   DISCUSSION

In this case the ALJ improperly discounted the opinions of plaintiff's treating physician in violation of the treating physician rule and failed to develop the record to address any gaps in the treating physician's records.[3]

Plaintiff testified that Dr. Jacobson was her "primary doctor" who "deals with [her] major physical impairments." (Tr. 39, 40.)  She also produced medical records from her doctor-patient relationship with Dr. Jacobson that stretched back several years, to at least January 2009.  (Tr. 268.)  Her testimony and evidentiary support clearly indicated that Dr. Jacobson was her treating physician, a relationship that takes on special significance in the assessment of disability under the Social Security Act.

Under the treating physician rule, ALJ Russack was obligated to give Dr. Jacobson's opinion controlling weight if it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques and … not inconsistent with the other substantial evidence in [plaintiff's] case record."  20 C.F.R. § 404.1527(c)(2).  If the ALJ determined that Dr. Jacobson's opinion was not entitled to controlling weight, he was obligated to consider certain factors to determine its appropriate weight, including "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a

---

[3] In light of the Court's determination that the ALJ violated the treating physician rule and did not carry out his duty to develop the record, the Court does not consider plaintiff's other challenges to the ALJ's decision.  On remand, the ALJ may revisit other aspects of his decision on a full record as appropriate.

whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004).

The ALJ did not give Dr. Jacobson's medical opinion controlling weight, nor did he consider the required factors in determining the opinion's proper weight. Instead, ALJ Russack gave "little weight" and "no special significance" to Dr. Jacobson's assessment of a one hundred percent disability because "the assessment was inconsistent with [plaintiff's] latest physical … was based on worker compensation rules and regulations[,] and represent[ed] an opinion on an issue reserved to the Commissioner of Social Security." (Tr. 16.)

The ALJ was correct that whether an individual meets the statutory definition of disability is a matter reserved to the Commissioner, and thus that even a treating physician's view on that question is not afforded any special significance. See 20 C.F.R. § 404.1527(d). But "it is important to distinguish between those portions of the physicians' reports that represent the physicians' medical findings and those portions of the reports that represent conclusions as to the claimant's disability for purposes of worker's compensation." Coria v. Heckler, 750 F.2d 245, 247 (3d Cir. 1984). Dr. Jacobson's records offered more than a bare opinion as to plaintiff's disability; instead, the records recounted diagnoses, MRI and EMG tests, objective medical findings regarding plaintiff's range of motion and sensation, and prescribed medication and other treatments. (Tr. 212-68.) These assessments provided the basis for Dr. Jacobson's opinion that plaintiff was disabled according to

the standards of the New York State Workers' Compensation Board.  Even if the
ALJ was entitled to accord Dr. Jacobson's final opinion as to disability no significant
weight, it was error to proceed as if Dr. Jacobson's underlying medical opinions
were inseparable from the disability opinion they informed.

Dr. Jacobson's objective medical findings should have been given either
controlling weight or an appropriate weight in light of the five factors listed above.
Although ALJ Russack arguably considered one of those factors, "the consistency of
the opinion with the record as a whole," when he noted that Dr. Jacobson's
"assessment was inconsistent with [plaintiff's] latest physical," this consideration
was inadequate.  Nowhere did the ALJ consider the length, nature, and extent of
plaintiff and Dr. Jacobson's treatment relationship, or the evidence Dr. Jacobson
identified as supporting his opinion, or whether Dr. Jacobson was a specialist.  The
ALJ's determination therefore failed to comply with the requirement that it
"contain specific reasons for the weight given to the treating source's medical
opinion, supported by the evidence in the case record."  SSR 96-2P, 1996 WL
374188, at *5 (July 2, 1996).

The ALJ's willingness to substitute his view of plaintiff's medical condition
for Dr. Jacobson's was also evident from his conclusion that plaintiff had
exaggerated her reports of pain because "[h]ad [her] pain been as debilitating as she
testified she would have sought other treatment methods to alleviate her pain."  (Tr.
16.)  Dr. Jacobson, as plaintiff's treating physician, was charged with prescribing
her medication and other therapy aimed at alleviating her back disorder.  Without

more specific reasoning as required by regulation, ALJ Russack's interpretation of Dr. Jacobson's treatment plan was inconsistent with "the deference to which a treating source's medical opinion should be entitled."  SSR 96-2P, 1996 WL 374188, at *1.

In addition, even if the ALJ had understood plaintiff's treating physician to offer nothing more than an opinion as to disability, "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record."  Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999).   ALJs have an affirmative duty to develop the record, "even when the claimant is represented by counsel."  Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996).  Dr. Jacobson had significantly more experience with plaintiff than any of the other physicians who contributed to the record or testified, and he may have been able to provide medical records that assessed plaintiff's condition without venturing an opinion on a question committed to the Commissioner.  It was improper for the ALJ to determine that the treating physician's opinions were due little weight without seeking to fill any gaps in those opinions or at a minimum offering plaintiff an opportunity to do so.

IV.     CONCLUSION

Accordingly, plaintiff's motion is GRANTED, defendant's motion is DENIED, and this case is remanded to the Commissioner for further proceedings. On remand, the ALJ shall issue a new decision consistent with this Opinion & Order. The ALJ may reconsider any other aspect of his decision as appropriate on a complete record.

The Clerk of Court is directed to terminate the motions at ECF Nos. 14 and 20, to terminate this action, and to remand this action to the Commissioner for further proceedings consistent with this Opinion & Order.


        SO ORDERED.

Dated:          New York, New York
                November 16, 2015

                                        _____
                                                KATHERINE B. FORREST
                                                United States District Judge